# IN THE COURT OF APPEALS OF THE STATE OF IDAHO

## Docket No. 50446

CHRIS D. FARNSWORTH,

    Petitioner-Appellant,

v.

SHAWNEE D. FARNSWORTH,

    Respondent.

)
)
)
)
)
)
)
)
)
)
)

Opinion Filed: October 23, 2024

Melanie Gagnepain, Clerk

Appeal from the District Court of the Seventh Judicial District, State of Idaho, Bonneville County. Hon. Michael J. Whyte, District Judge. Hon. Michelle R. Mallard, Magistrate.

Memorandum Decision and Order Re: Appeal, on intermediate appeal from the magistrate court, <u>affirmed</u>.

Smith Woolf Anderson & Wilkinson, PLLC; Aaron J. Woolf, Idaho Falls, for appellant.

Castleton Law Office; Trevor L. Castleton, Blackfoot; Swafford Law, P.C., Ronald L. Swafford, Idaho Falls, for respondent.

---

HUSKEY, Judge

Chris D. Farnsworth[1] appeals from the district court's Memorandum Decision and Order Re: Appeal, on intermediate appeal from the magistrate court, affirming: (1) the magistrate court's determination and characterization of the joint tenant with rights of survivorship account held by Edward Jones as containing both separate and community funds; (2) the magistrate court's characterization of the PERSI Choice account as a community asset; (3) the magistrate court's award of attorney fees to Shawnee D. Farnsworth; and (4) the magistrate court's denial of Chris's motion for possession of the marital home. Shawnee contends the district court properly considered the division and characterization of assets and appropriately affirmed the second

---

[1] Because the parties share a last name, each will be referred to by their first name for clarity. No disrespect is intended to the parties by this reference.

1

amended judgment and decree of divorce from the magistrate court. For the following reasons, we affirm the district court.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

Chris and Shawnee Farnsworth married on July 20, 1996. Prior to marriage, each owned a separate residence and had separate assets.[2] Relevant to this appeal, Shawnee had an investment account with American Funds with a balance of $188,518.33 and owned a home on Nathan Circle. Shawnee asked Chris to sign a prenuptial agreement regarding the American Funds account, which Chris declined to do, so the parties married without one. Around 2002, unbeknownst to Shawnee, Chris began hiding the monthly statements of the American Funds account to "protect himself" and so he would not be "taken advantage of" because community funds were used to pay taxes on the account. Shawnee did not learn of the hidden statements until after Chris initiated the divorce proceedings in 2017.

In 2003, Chris was added as a co-owner of the American Funds account which became a joint tenancy with rights of survivorship account. The parties testified to different reasons for adding Chris to the account, but both parties acknowledge that at least one reason was to allow Chris access to the funds in the event Shawnee became incapacitated because, at the time, the parties had two young children. Chris had the ability to deposit or withdraw funds from the American Funds account, although Shawnee was unaware of his authority. In 2013, the American Funds account was transferred intact to an Edward Jones joint tenants with rights of survivorship account (EJJTROS). Chris did not exercise his authority to deposit, withdraw, or directly invest with the EJJTROS account during the marriage except once when he wrote a check and Edward Jones called Shawnee for approval for the transaction. All withdrawals on the account were made by Shawnee. The fund continued to earn interest throughout the course of the marriage. Chris and Shawnee paid household bills and other expenses with the earned interest but the principal of the account was never reduced. In 2015, Chris recorded a conversation between himself and Shawnee about the EJJTROS account, unbeknownst to Shawnee. Chris preserved this recording for two years prior to instituting divorce proceedings and introduced it as evidence of Shawnee's intent to transmute the EJJTROS account to community property.

---

[2] Chris and Shawnee have additional retirement accounts and other assets. The division of the other accounts and assets is not at issue on appeal.

In 2012, the City of Idaho Falls (the City), Chris's employer, and the local firefighters' union negotiated a contract pursuant to federal law that allowed the City to opt out of contributing to Social Security on behalf of its firefighters. Instead of contributing to Social Security, the City would contribute an equivalent amount of money into a PERSI Choice 401(k) account. Each firefighter had to affirmatively elect and create a PERSI Choice 401(k) account. Once a firefighter created the account, the City would make mandatory deposits to the account. Once those deposits were made, each firefighter, including Chris, had the ability to move or withdraw the funds.

After marriage, Chris moved into Shawnee's house on Nathan Circle. The home on Nathan Circle was refinanced several times throughout the marriage. Through the refinancing process, each refinance recorded the deed of trust and title to the property as Chris Farnsworth and Shawnee Farnsworth, husband and wife. The 1999 and 2006 credit applications used for refinancing included the incomes of both Chris and Shawnee but did not list the American Funds account as an asset. Community funds were used to pay the mortgage debt and living expenses.

Chris filed a petition for divorce based on irreconcilable differences in March 2017. In April 2017, Shawnee filed an answer and counterpetition citing irreconcilable differences. In May 2017, Shawnee filed a motion to amend her counterpetition to cite adultery and extreme cruelty as the bases for divorce. The magistrate court orally granted the amendment, but the order was not issued until November 2, 2018. A bench trial was held over nonconsecutive dates between November 2018 and January 2019. After the trial began, Chris stipulated to divorce on the grounds of adultery and extreme cruelty.

Following the hearing, the magistrate court concluded that Chris had proven by clear and convincing evidence that Shawnee intended to transmute the home on Nathan Circle from her separate property to community property because community funds were used to pay the mortgage, improvements, remodels and repairs; Shawnee quitclaimed the deed from herself as a single person, to her and Chris, wife and husband; the home was refinanced multiple times; and each time the home was refinanced, the financial documents listed Chris as an owner. In its April 23, 2019, memorandum decision, the magistrate court found the marital home was community property and that Chris was entitled to half of the value of the home; however, the memorandum decision did not list the mechanism by which the value would be determined or the mechanism for providing Chris half of the equity.

The magistrate court held that Chris failed to establish by clear and convincing evidence that Shawnee intended to transmute the EJJTROS account to community property and, thus, it remained Shawnee's separate property. However, the magistrate court concluded that some of the income generated from the EJJTROS account was community property. In determining which portion of the EJJTROS account was community property, the magistrate court initially adopted the calculations of Shawnee's expert, Terri Gadzik, to determine the separate and community property portions of the EJJTROS account.

The magistrate court also held Chris's PERSI choice 401(k) account was community property. The magistrate court relied on Idaho precedent and characterized Chris's PERSI Choice 401(k) account as community property because, generally, PERSI accounts acquired during marriage are presumed to be a community asset. The magistrate court found that the PERSI Choice 401(k) account was acquired during the marriage and the contributions used to fund the account came from Chris's wages. Further, the magistrate court found the plan was "in Chris' complete control. At any time he could access the funds in this account. There may be penalties attached, but this accessibility makes it distinctly different than Social Security benefits." The magistrate court explained that under the facts and relevant precedent, it was constrained to conclude the PERSI Choice account was community property. Last, the magistrate court awarded attorney fees to Shawnee for the time spent addressing the adultery and extreme cruelty bases for the divorce because Chris waited until after the trial began to stipulate to divorce on those grounds.

Chris filed a motion for reconsideration on various grounds, but as relevant here, he challenged the characterization of the EJJTROS account and the use of Gadzik's values, the award of attorney fees to Shawnee, and the magistrate court's characterization of the marital home and how it should be allocated. Following a hearing, the magistrate court entered an order which held the marital home was community property and awarded possession to Shawnee so long as she refinanced the home within ninety days to remove Chris's name from the debt obligations and reimbursed Chris one-half of the equity in the home. This holding was reflected in the March 7, 2020, Amended Judgment and Decree of Divorce and the September 22, 2020, Second Amended Judgment and Decree of Divorce. The community property portion of the EJJTROS was determined to be $180,904.53. The magistrate court upheld its award of attorney fees to Shawnee; however, the court reduced the amount by $1,000.

4

Thereafter, Chris filed a motion for possession of the home on Nathan Circle. The basis of Chris's request for possession was that Shawnee failed to refinance the home within the allotted timeframe and, as a result, forfeited her right to possession. Chris argued that under the terms of the decree, he was entitled to possession and would refinance to remove Shawnee from the mortgage debt. Shawnee objected to the motion arguing she was in the process of refinancing. Following a hearing, the magistrate court denied Chris's motion for possession of the home.

During the motion hearing, the parties argued regarding attorney fees. The magistrate court held that Shawnee was entitled to attorney fees, but the court declined to rule on the appropriateness of the amount sought. The court issued a second amended judgment and decree of divorce and specified the final division of contested assets.

Chris appealed[3] to the district court, arguing the magistrate court erred by: (1) characterizing the EJJTROS account as Shawnee's separate property; (2) characterizing his PERSI Choice 401(k) account as community property; (3) imposing attorney fees against him for Shawnee's litigation preparation based on adultery and extreme cruelty as the grounds for the divorce; and (4) permitting Shawnee to refinance the marital home after the ninety days had expired.[4] The district court affirmed the magistrate court's conclusion that the EJJTROS account was Shawnee's separate property. The district court found the magistrate court erred in relying on Gazdik's testimony regarding the valuation of the portions of the EJJTROS account as community and separate property because Gadzik's testimony conflicted with both her and Chris's expert valuation reports. The district court remanded the issue of the EJJTROS account to the magistrate court to reconsider the apportionment of the EJJTROS account. The district court affirmed the magistrate court's finding that the PERSI Choice 401(k) account was community property. The district court held that because there was no Idaho caselaw that a PERSI Choice 401(k) account that was created and funded during the marriage should be treated the same as Social Security benefits, the magistrate court's decision treating the account as a voluntary retirement account, and therefore, community property, could not and did not constitute an abuse of discretion. The district

---

[3]     Chris amended his notice of appeal to the district court several times. At issue in his appeal to the district court is his Third Amended Notice of Appeal filed December 1, 2021.

[4]     In his intermediate appeal, Chris raised additional issues, including that the magistrate court erred in: (1) its apportionment of the value of the EJJTROS account as community and separate property; and (2) the date of valuation for certain retirement accounts. These claims are not at issue on appeal to this Court.

5

court affirmed the magistrate court's denial of Chris's motion for possession of the home and extension of time for Shawnee to refinance the home because the relief Chris requested was not available in the original judgment and, thus, the denial of the motion was not a modification of the initial judgment or either of the amended judgments and decrees of divorce. The district court determined that Chris had received what he was entitled to under the judgments because Shawnee refinanced the home, removed Chris from all financial obligations regarding the home, and provided him with his share of the equity.

Finally, the district court affirmed the award of attorney fees to Shawnee for litigation preparation on the adultery and extreme cruelty grounds for divorce only to have Chris stipulate to those grounds; the district court concluded the magistrate court did not abuse its discretion because it properly considered the relevant factors in Idaho Code § 32-705(2). In addition, the district court concluded that the magistrate court explained the application of the factors to the facts and reached a reasoned conclusion. The district court found the magistrate court understood its discretion, understood the relevant law, acted within the bounds of that law, and reached its conclusion by an exercise of reason. Chris appeals from the district court's Memorandum Decision and Order Re: Appeal.

## II.

## STANDARD OF REVIEW

For an appeal from the district court, sitting in its appellate capacity over a case from the magistrate court, we review the record to determine whether there is substantial and competent evidence to support the magistrate court's findings of fact and whether the magistrate court's conclusions of law follow from those findings. *Pelayo v. Pelayo*, 154 Idaho 855, 858-59, 303 P.3d 214, 217-18 (2013). However, as a matter of appellate procedure, our disposition of the appeal will affirm or reverse the decision of the district court. *Id*. Thus, we review the magistrate court's findings and conclusions, whether the district court affirmed or reversed the magistrate court and the basis therefor, and either affirm or reverse the district court.

Where a trial court sits as a finder of fact without a jury, the court is required to enter findings of fact and conclusions of law. I.R.C.P. 52(a); *Estate of Hull v. Williams*, 126 Idaho 437, 440, 885 P.2d 1153, 1156 (Ct. App. 1994). Our review of the trial court's decision is limited to ascertaining whether substantial, competent evidence supports the findings of fact, and whether the trial court correctly applied the law to the facts as found. *Borah v. McCandless*, 147 Idaho 73,

6

77, 205 P.3d 1209, 1213 (2009); *Cummings v. Cummings*, 115 Idaho 186, 188, 765 P.2d 697, 699 (Ct. App. 1988). Thus, we defer to findings of fact that are not clearly erroneous, but we freely review the trial court's conclusions of law reached by applying the facts found to the applicable law. *Staggie v. Idaho Falls Consol. Hosps., Inc.*, 110 Idaho 349, 351, 715 P.2d 1019, 1021 (Ct. App. 1986). Where there is conflicting evidence, it is the trial court's task to evaluate the credibility of witnesses and to weigh the evidence presented. *Desfosses v. Desfosses*, 120 Idaho 354, 357, 815 P.2d 1094, 1097 (Ct. App. 1991). We will not set aside the trial court's factual findings as clearly erroneous if they are supported by substantial and competent, even if conflicting, evidence. *Kennedy v. Schneider*, 151 Idaho 440, 442, 259 P.3d 586, 588 (2011). Evidence is substantial and competent if a reasonable trier of fact would accept that evidence and rely on it to determine whether a disputed point of fact was proven. *Hull v. Giesler*, 156 Idaho 765, 772, 331 P.3d 507, 514 (2014); *Hutchison v. Anderson*, 130 Idaho 936, 940, 950 P.2d 1275, 1279 (Ct. App. 1997)

## III.

## ANALYSIS

Chris argues the district court erred in affirming the magistrate court's findings in four ways: (1) the magistrate court's characterization of the EJJTROS account as Shawnee's separate property was not supported by substantial and competent evidence because it was evident from the circumstances the account had been transmuted into community property; (2) the magistrate court's characterization of Chris's PERSI Choice 401(k) account as community property was not supported by substantial and competent evidence because contributions were involuntary, and therefore, should be treated like Social Security; (3) the magistrate court's award of attorney fees erroneously rested on a single factor rather than evaluating all of the factors under I.C. § 32-705(2); and (4) the magistrate court improperly amended the divorce decree regarding the marital home. Shawnee contends the district court correctly affirmed the magistrate court's determination that the EJJTROS is her separate property based on the intention and behavior of the parties. Shawnee also argues the district court correctly affirmed the magistrate court's characterization of the PERSI Choice 401(k) account as community property because it is not the functional equivalent of Social Security benefits and, therefore, the account is divisible community property. Shawnee argues the district court correctly affirmed the award of attorney fees after considering the factors under I.C. § 32-705(2). Finally, Shawnee argues the district court correctly affirmed the magistrate

7

court regarding the marital home because the magistrate court did not alter the divorce decree when it found the language did not support the relief Chris was seeking. Both parties request attorney fees on appeal

## A. The Edward Jones Joint Tenancy with Rights of Survivorship Account Is Separate Property

Chris argues the district court erred in affirming the magistrate court regarding the EJJTROS account because the magistrate court's findings of fact are not supported by substantial and competent evidence. Chris argues the magistrate court ignored the substance and purpose of the 2003 letter adding him as a co-owner of the account. Chris argues it is clear the EJJTROS account was transmuted to community property when Shawnee added him as a joint owner on the account which granted him all the authority of an owner to deposit, withdraw, and otherwise transfer funds. Further, Chris argues that because Shawnee took affirmative steps to make him a joint owner, the 2003 letter is the dispositive piece of evidence that demonstrates the EJJTROS account should be characterized as community property and not as Shawnee's separate property. Shawnee asserts Chris's reliance solely on the 2003 letter to show her intent regarding the EJJTROS account is misplaced for several reasons: (1) adding Chris as a joint owner to the account does not result in an automatic determination or even a presumption of donative intent because the letter only created a contract between Chris and American Funds and the ownership of the funds was not affected by the contract between Chris and American Funds; (2) adopting Chris's argument would eviscerate the standard set forth in I.C. § 15-6-104; (3) whether Chris met his burden of proof is a factual question; and (4) the magistrate court reviewed all the evidence, not just the 2003 letter, correctly identified the relevant law, made credibility determinations, and made numerous detailed findings of fact before concluding Chris had not established by clear and convincing evidence that Shawnee intended to transmute the property.

The characterization of property as either community or separate presents a mixed question of law and fact. *Robirds v. Robirds*, 169 Idaho 596, 604, 499 P.3d 431, 439 (2021) Although the manner and method of acquisition of property are questions of fact for the trial court, the characterization of an asset in light of the facts found is a question of law over which we exercise free review. *Id.* Whether a specific piece of property is characterized as community or separate property depends on when it was acquired, and the source of the funds used to purchase it. The character of property vests at the time the property is acquired. *Id.* at 608, 499 P.3d 443.

8

Idaho Code § 32-903 states that all property owned by a spouse before marriage remains that spouse's separate property. Idaho Code § 32-906 states that all other property acquired after marriage, including income on separate property, is community property. "As a general rule, the natural enhancement in value of separate property during coverture does not constitute community property; however, to the extent an enhancement in value is due to community efforts, labor, industry or funds, it falls into the community." *Papin*, 166 Idaho at 25, 454 P.3d at 1108 (quoting *Speer v. Quinlan, In and For Lewis Cnty.*, 96 Idaho 119, 127, 525 P.2d 314, 322 (1973)). "[T]he natural enhancement of a separate property asset due to market trends, inflation, etc., and which is not attributable to community efforts or to rents and profits of the assets, is separate property." *Robirds*, 169 Idaho at 608, 499 P.3d at 443 (quoting *Papin*, 166 Idaho at 25, 454 P.3d at 1109).

"Transmutation" is defined as: "A change in the nature of something: esp., in family law, the transformation of separate property into marital property, or of marital property into separate property." *Black's Law Dictionary* (12th ed. 2024); *see also Ustick v. Ustick*, 104 Idaho 215, 223, 657 P.2d 1083, 1091 (Ct. App. 1983) ("Transmutation is a broad term used to describe arrangements between spouses which change the character of property from separate to community and vice versa."). Donative intent may be proven by direct evidence, including statements of donative intent or inferences drawn from the surrounding circumstances, such as the relationship between the donor and donee. *Banner Life Ins. Co. v. Mark Wallace Dixson Irrevocable Trust*, 147 Idaho 117, 126, 206 P.3d 481, 490 (2009); *Estate of Hull*, 126 Idaho at 443-44, 885 P.2d at 1159-60. The existence of donative intent is a factual finding to be made by the trial court. *See Nielson v. Davis*, 96 Idaho 314, 315, 528 P.2d 196, 197 (1974). The determination of whether property has been transmuted, from separate to community property or vice versa, is a question of intent. *Barrett v. Barrett*, 149 Idaho 21, 23, 232 P.3d 799, 801 (2010).

In determining donative intent, a trial court is not limited to looking only at the language of a document even where the language of that document is plain and unambiguous. This is because "the determination whether property has been transmuted is a question of fact turning on intent. In making this factual determination, trial courts are free to consider all relevant evidence regarding that intent." *Id*. at 25, 232 P.3d 803. The Idaho Supreme Court has rejected the idea that a single piece of evidence is conclusive as to the characterization of the property. *See Kawamura v. Kawamura*, 159 Idaho 1, 4, 355 P.3d 630, 633 (2015) (noting it is mistake to hold

9

that "an unambiguous deed is conclusive as to the character of property acquired by that deed"); *see also Kraly v. Kraly*, 147 Idaho 299, 302, 304, 208 P.3d 281, 284, 286 (2009) (rejecting wife's claim that because warranty deed unambiguously identified property at issue as community property, it was dispositive as to property's character).

In this case, the magistrate court correctly noted the relevant legal standard--that intent to transmute the property was a factual finding, the intent must be proven by clear and convincing evidence, and what evidence it could consider in making its determination. The magistrate court considered the existence and substance of the 2003 letter as it was the basis of Chris's argument of transmutation. The magistrate court then considered the other evidence and its relation to, and impact upon, the 2003 letter. The magistrate court specifically noted that it found Shawnee's testimony regarding her intent not to transmute the account to be very persuasive. After assessing all the evidence, the magistrate court found Chris had not met his burden of proving by clear and convincing evidence that Shawnee intended to transmute the EJJTROS account into community property because the magistrate court found that the purpose of the 2003 letter was not to transmute the account from Shawnee's separate property into community property, but instead, the purpose was to add Chris to the account to provide him access in the event Shawnee was incapacitated so that their minor children would have financial security. Because Chris failed to establish Shawnee's donative intent, the EJJTROS account remained Shawnee's separate property.

On intermediate appeal, the district court considered the evidence analyzed by the magistrate court, discussed each of the magistrate court's findings, and acknowledged there was conflicting evidence presented during the trial. The district court found that substantial and competent evidence supported all of the magistrate court's factual findings, including the lack of donative intent and the legal conclusion that flowed therefrom, i.e., that the EJJTROS account remained Shawnee's separate property. As a result, the district court affirmed the magistrate court's finding that the EJJTROS account was Shawnee's separate property. We agree.

On appeal to this Court, Chris asserts the 2003 letter is dispositive and it clearly demonstrates Shawnee's intent to transmute the account to community property. However, as noted above, a trial court is free to consider all relevant evidence. In this case, the magistrate court considered all the evidence and declined to find the 2003 letter as the single, dispositive piece of evidence. Shawnee testified that prior to writing the 2003 letter, she consulted with her accountant, her attorney, a financial advisor, and a customer service representative of American Funds

10

regarding how to accomplish her intention to keep her property separate but to give Chris access to the accounts for the financial security of the children should she become incapacitated. Shawnee further testified that the wording of the letter was dictated by the American Funds customer service representative. Shawnee said her use of the term "joint owner" was because the representative told her to use that term but she "didn't know what the words meant." Shawnee also testified she had no intention of gifting Chris half of the account, and if she understood that was the meaning of the term "joint owner," she would never have used it. Shawnee also testified about her surprise at the scope of Chris's authority on the EJJTROS account. The magistrate court found her testimony credible and persuasive.

The magistrate court articulated the circumstances surrounding the formation of the EJJTROS account--from the undisputed origin of the account as Shawnee's separate property, to the addition of Chris's name to the account--and the treatment of the funds within the account throughout the marriage. The magistrate court also considered Shawnee's request for a prenuptial agreement regarding the account prior to marriage. The magistrate court considered the way the account was handled during the marriage. For example, although Chris was added as a full co-owner of the account, his testimony established that he never acted or used his authority except the one time that he sought to write a check on the account and the bank called Shawnee to approve Chris's actions. The evidence further established that it was Shawnee who withdrew funds and directed investments. The magistrate court found that Chris's actions over the course of the marriage undermined his assertion that the account was considered community property by both of them. The magistrate court noted:

> Throughout the marriage, almost from the beginning, Chris tried to garner evidence surreptitiously to prove he was entitled to half of Shawnee's EJJTROS account. The hidden statements and the recording of a conversation without Shawnee's knowledge indicate to this Court that Chris knew that Shawnee considered the account her separate property. If it were clear to both parties that Shawnee intended the account to be community property, Chris would not have had to take such underhanded actions in regard to the account.

The magistrate court also found that Chris's hiding of the statements "to protect himself" implied that he knew Shawnee considered the American Funds account her separate property. Additionally, when Shawnee learned in 2017 by text message that Chris had hidden some American Funds statements from her, she was surprised and wondered why he was hiding "her" documents. The magistrate court also considered that the 1999 and 2006 mortgage refinancing

11

applications did not list the American Funds account as an asset. The magistrate court considered Chris's acknowledgment of being added in case of Shawnee's incapacitation.

Thus, in addition to the 2003 letter, the magistrate court properly considered other relevant evidence. The magistrate court was in the best position to assess credibility and resolve conflicts in the evidence. The magistrate court's factual findings regarding Shawnee's lack of donative intent are supported by substantial and competent evidence. Once the magistrate court determined Chris had not established Shawnee's intent to transmute the EJJTROS account, it correctly determined that because the EJJTROS account started as Shawnee's separate property account, it remained Shawnee's separate property. It then apportioned the income generated from the EJJTROS account and assigned a portion of the income as community property and a portion of the income as Shawnee's separate property. Therefore, the magistrate court had substantial and competent evidence to reach its conclusion, and the district court did not err in affirming the magistrate court's characterization of the EJJTROS account as separate property.

## B. Chris's PERSI Choice 401(k) Account Is Community Property

Chris argues the district court erred in affirming the characterization of the PERSI Choice 401(k) account as community property because contributions were involuntary and in lieu of Social Security and Medicare contributions. Chris notes that he will receive Social Security benefits related to his employment prior to 2012. However, those benefits may be reduced, in part, based on the amount of his PERSI Choice 401(k) account and, therefore, he argues the PERSI Choice 401(k) account should be treated as Social Security benefits and remain his separate property. Chris also argues that the "in lieu of" language in the Memorandum of Understanding (MOU) between the local firefighters' union and the City opting out of Social Security demonstrates that this account was intended to be "in lieu of" his Social Security benefit, and therefore should be characterized as his separate property. Shawnee contends that the PERSI Choice 401(k) account is not the same as Social Security because the nature of a PERSI Choice 401(k) account differs in several important ways from a Social Security account. She also argues the MOU did not create a social security-like benefit but, instead, the MOU was created to preserve the tax-deferred nature of contributions and the "in lieu of" language Chris relies on establishes the amount of the contribution but does not relate to the type of account.

Social Security benefits are governed by federal law and cannot be split, transferred, or otherwise conferred to another, even during a divorce proceeding. "[T]he statutory scheme of the

[Social Security Administration] is in actual conflict with, and thus preempts, the state community property law that would otherwise dictate the delineation of property." *United States v. Swenson*, 971 F.3d 977, 983 (9th Cir. 2020). Social security benefits "are not a divisible community asset." *Id.* (quoting *Sherry v. Sherry*, 108 Idaho 645, 650, 701 P.2d 265, 270 (Ct. App. 1985)).

In this case, the local chapter of the International Association of Firefighters passed a "Referendum B," which, as of July 16, 2012, rendered the City of Idaho Falls firefighters ineligible for federal Social Security benefits. As a result of the referendum, the City entered into an agreement with the federal government that would permit the City to opt out of contributing to Social Security and Medicare. The City then entered into an MOU with the local firefighters' union. In relevant part, the MOU states:

> WHEREAS, Firefighters desire to maintain the tax-deferred nature of retirement contributions in lieu of Federal, State, FICA and Medicare contributions:
> WHEREAS, the City is willing to provide a mechanism by which such tax deferred contributions can be preserved . . . .
> Commencing with the August 3, 2012, payroll and continuing with each regular paycheck thereafter, the City shall, in lieu of paying Social Security and Medicare contributions where applicable, on behalf of each Firefighter employee, pay into each PERSI Choice 401(k) Plan account established by such Firefighters, an amount equal to the matching employee and employer contributions that would have otherwise been paid for each Firefighter pursuant to U.S.C. Title 26, Chapter 21--the Federal Insurance Contributions Act, less any charges, expenses, or retirement withholdings imposed upon the City by the United States Government and/or PERSI. . . .
> The parties intend that these matching contributions be treated as Employer Contributions to each individual Firefighter's PERSI Choice 401(k) Account and will be governed by the rules, regulations, and laws applicable to PERSI.

Based on the plain language of the MOU, one of the main goals of the MOU between the City and the firefighters' union was to "maintain the tax-deferred nature of retirement contributions in lieu of Federal, State, FICA and Medicare contributions." Also pursuant to the MOU, the City agreed to "provide a mechanism by which such tax deferred contributions can be preserved." Unlike social security, this mechanism required each firefighter to create a PERSI Choice 401(k) account, and once the account was created, the City would deposit a sum equal to the amount of the Social Security and Medicare contributions. The MOU further indicates that withholdings and contributions will be governed by Idaho law applicable to PERSI. PERSI is a state-created retirement plan under I.C. § 59-1301, *et seq.*, and PERSI accounts are an asset that can be

13

split between divorcing spouses pursuant to a qualified domestic relations order. I.C. §§ 59-1317, -1319.

The magistrate court evaluated all the evidence related to the PERSI Choice 401(k) plan and found that Chris's wages partially funded the account and Chris retained control over the funds in the account. The magistrate court further concluded that although penalties might exist for withdrawal, Chris could access the funds at any time, making the PERSI Choice 401(k) plan uniquely different from Social Security benefits which are inaccessible prior to reaching the age of retirement or a qualifying disability. The magistrate court relied on *Banner Life Ins., Co.*, which identified pertinent characteristics of assets in order to classify as either community or separate property. Under *Banner Life Ins., Co.*, absent a showing that the asset was acquired before marriage, funded by a separate property source, or acquired through a gift or inheritance, the presumption is an asset acquired during marriage is community property. *Banner Life Ins., Co.*, 147 Idaho at 124, 206 P.3d at 488. The magistrate court concluded that because the PERSI Choice 401(k) account is not the same as Social Security and is governed by Idaho law which designates these types of accounts as community property accounts, Chris's PERSI Choice 401(k) account is a community property asset that is capable of division during a divorce. The magistrate court declined "to create new law regarding the characterization of this property" and found it could only follow the path as law required--a PERSI Choice 401(k) account is community property.

The district court reviewed the magistrate court's findings under an abuse of discretion standard and concluded the magistrate court did not abuse its discretion in concluding the PERSI Choice 401(k) account was community property because nothing in Idaho law supports a finding that the account was a similar instrument to Social Security. The dispositive aspects were the voluntariness of the plan and the ability to access the funds at any time.

On appeal to this Court, Chris argues the district court erred in applying an abuse of discretion standard of review. We agree the district court incorrectly applied an abuse of discretion standard to evaluate the issue, and this Court will freely review whether the PERSI Choice 401(k) account is properly characterized as community property. Chris argues the district court erred in treating the PERSI Choice 401(k) account as community property because Idaho law supports treating the PERSI Choice 401(k) account as equivalent to Social Security based on *McGrew v. McGrew*, 139 Idaho 551, 559-60, 82 P.3d 833, 841-42 (2003). Unlike Social Security benefits or the Tier I benefits in *McGrew*, Shawnee argues that Chris had to choose to create the PERSI Choice

14

401(k) account, had to authorize contributions, could access the money at any time, and the account was governed under the laws applicable to PERSI; therefore, the district court correctly characterized it as community property.

In *McGrew*, a husband had two types of railroad retirement benefits. One component, commonly called Tier I benefits, is an annuity designed to be equivalent to the old age or disability insurance benefit that would have been received under the Social Security Act. *Id*. at 559, 82 P.3d at 841. The Supreme Court noted that the Tier I benefits were not divisible by a court upon divorce. *Id*. at 560, 82 P.3d at 842. The other component, commonly called Tier II benefits, is an additional annuity that, like a private pension plan, is tied to the earnings and career service. *Id*. at 559-60, 82 P.3d at 841-42. The Tier II benefit also had a component similar to divorced spouse's benefits under the Social Security Act. *Id*. The wife sought a portion of the Tier II benefits pursuant to the divorce. *Id*.

Chris argues the Tier 1 benefits are equivalent to the firefighters having their Social Security benefits paid to their PERSI Choice 401(k) accounts. *McGrew* is not dispositive on this issue, not least because the characterization of the Tier I benefits were not at issue in *McGrew*. Moreover, in *McGrew*, the Railroad Tier I retirement benefits were created pursuant to a federal statute which, by its language, limits the Tier I benefits to an amount equal to the amount of Social Security benefits to which the individual would have been entitled and, most importantly, is only accessible upon reaching the retirement age as defined by the Social Security Act. 45 U.S.C. §§ 231a(b)(1), 231a(a)(1)(i). The internal references in the Railroad Retirement Act to the Social Security Act, demonstrate the intent for the railroad retirement benefits to be constrained by the language in the Social Security Act. 45 U.S.C. § 231a(a)(1)(i).

In this case, the MOU between the firefighters' union and the City does not incorporate any of the Social Security limitations or statutory language. In fact, the MOU makes clear that the parties are opting out of Social Security and creating a different retirement benefit altogether. The PERSI Choice 401(k) account is different from Social Security in other important ways. First, Social Security is not a system of earned property rights; in other words, individuals have no contractual or property rights to Social Security benefits or their mandatory contributions. *See Sherry*, 108 Idaho at 650, 701 P.2d at 270 (adopting with approval California courts' reasoning "based in part on United States Supreme Court cases holding that the Social Security Act, by means of a tax, creates a public benefit that can be reduced or altered, but it does not create either contract

15

or property rights"). In contrast, Idaho employees have a contractual right to PERSI benefits once vested in PERSI. *See Jackson v. Minidoka Irrigation Dist.*, 98 Idaho 330, 335, 563 P.2d 54, 59 (1977) (holding "It is true that employer contributory retirement benefits constitute deferred compensation to the employee. The pension plan becomes part of the contract of employment and contractual rights to the retirement benefits can thus be created between an employer and his employees") (citations omitted).

Second, unlike Social Security or the Tier I benefits in *McGrew*, the goal of the MOU between the City and the Firefighters was not to provide a specific type of benefit, but instead, "to maintain the tax-deferred nature of retirement contributions in lieu of Federal, State, FICA and Medicare contributions." Thus, the MOU required the City to create a mechanism that would maintain the tax-deferred nature of the benefit rather than define the type of benefit itself. Third, nothing in the MOU indicates the PERSI Choice 401(k) account shall be "in lieu of" a Social Security-like benefit. The MOU states: "in lieu of paying Social Security and Medicare contributions where applicable," the City would pay into the PERSI Choice 401(k) account "an amount equal to the matching employee and employer contributions that would have otherwise been paid." Thus, the phrase "in lieu of" relates to the amount of the payment not to the characterization of the account wherein the payment is deposited. Finally, the PERSI Choice 401(k) account is governed by the rules, regulations, and laws applicable to PERSI. These rules give Chris control over the funds once they are in the account, including withdrawing money at any time, even if doing so incurs a penalty.

Chris presents case law from other states to demonstrate that certain retirement plans are treated similarly to Social Security, and therefore, Idaho should as well. He relies on *Kelly v. Kelly*, 9 P.3d 1046 (Ariz. 2000) and *Cornbleth v. Cornbleth*, 580 A.2d 369 (Pa. 1990). In both cases, the retirement plan in question was the Civil Service Retirement System (CSRS). The state courts determined that because the Social Security benefits were indivisible, one spouse was inequitably advantaged by that characterization when the CSRS benefits were characterized as community property and split between the parties. *Kelly*, 9 P.3d at 1049; *Cornbleth*, 580 A.2d at 371-72. The courts noted that, as to the CSRS benefits, "pension benefits that are 'in lieu of' social security can be set aside as separate property." *Kelly*, 9 P.3d at 1048. However, it is not at all clear that Chris's PERSI Choice 401(k) account was "in lieu of" his Social Security benefit; only

that the equivalent amount would be deposited in the PERSI Choice 401(k) account instead of a federal Social Security account and, thus, these cases are only marginally relevant.

There are substantive differences between Social Security benefits and a PERSI Choice 401(k) account. We also recognize that Chris's argument has some appeal regarding the fairness of dividing the account. Regardless, I.C. §§ 59-1317, 59-1319, and 59-1320 authorize the division of a PERSI account due to divorce if the retirement account is characterized as community property, as does relevant precedent. *See Banner Life Ins., Co.*, 147 Idaho at 126, 206 P.3d at 490. Absent Chris's ability to show the PERSI Choice 401(k) account was acquired before marriage, funded by a separate property source, or acquired through gift or inheritance, the presumption is an asset acquired during marriage is community property. Therefore, the magistrate court had substantial and competent evidence to reach its conclusion that the PERSI Choice 401(k) account was community property, and the district court did not err in affirming its decision.

## C.    Shawnee Is Entitled to Attorney Fees Regarding the Amendment of Her Counterpetition

Chris argues the district court erred in affirming the magistrate court's award of attorney fees to Shawnee because the magistrate court abused its discretion in awarding the fees. He argues the magistrate court failed to consider all the factors under I.C. § 32-705, relying on a single factor in its decision and, therefore, failed to act within the boundaries of discretion or act consistently with appropriate legal standards. He also argues the magistrate court lacked substantial and competent evidence to find Shawnee was entitled to fees because Chris reasonably assumed Shawnee had abandoned her motion to amend the counterpetition to allege adultery and extreme cruelty. He asserts she abandoned her claim because the oral judgment granting the amendment was not entered as a written order until nearly a year and a half after Shawnee moved to amend the counterpetition. Shawnee argues the district court correctly affirmed the magistrate court's award because the magistrate court considered all the factors under I.C. § 32-705(2)(a)-(g). Shawnee argues that not all the factors need to be established in order to justify an award and Chris has failed to provide relevant authority to show the magistrate court abused its discretion. Finally, she argues Chris had actual notice that the bases of the divorce were adultery and extreme cruelty when he did not object to Shawnee amending her counterpetition to add these bases of the divorce and the magistrate court orally granted the motion to amend.

Idaho Code § 32-704(3) governs the ability of the court to award attorney fees:

17

The court may from time to time after considering the financial resources of both parties and the factors set forth in section 32-705, Idaho Code, order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this act and for attorney's fees, including sums for legal services rendered and costs incurred prior to the commencement of the proceeding or after entry of judgment.

The factors for consideration are enumerated in I.C. § 32-705:

1. Where a divorce is decreed, the court may grant a maintenance order if it finds that the spouse seeking maintenance:
    (a) Lacks sufficient property to provide for his or her reasonable needs; and
    (b) Is unable to support himself or herself through employment.
2. The maintenance order shall be in such amounts and for such periods of time that the court deems just, after considering all relevant factors which may include:
    (a) The financial resources of the spouse seeking maintenance, including the marital property apportioned to said spouse, and said spouse's ability to meet his or her needs independently;
    (b) The time necessary to acquire sufficient education and training to enable the spouse seeking maintenance to find employment;
    (c) The duration of the marriage;
    (d) The age and the physical and emotional condition of the spouse seeking maintenance;
    (e) The ability of the spouse from whom maintenance is sought to meet his or her needs while meeting those of the spouse seeking maintenance;
    (f) The tax consequences to each spouse;
    (g) The fault of either party.

The magistrate court identified the factors outlined in I.C. § 32-705 and analyzed each in turn. The magistrate court found that each party had sufficient means to provide for their needs and were gainfully and steadily employed. The parties had been married for twenty-one years and all other factors, other than fault, were equal. Under the fault factor, because Shawnee sought divorce based on adultery and extreme cruelty, and Chris ultimately stipulated to that ground, the fault factor weighed against Chris. Despite that attribution, the magistrate court stated, "it would be improper to have the determination of the attorney's fees issue turn on one factor" and awarded attorney fees only on efforts related to proving the adultery and extreme cruelty claims, with the remainder of the fees being the responsibility of the incurring party. The magistrate court awarded attorney fees on this limited basis, reasoning that because Chris ultimately stipulated to the adultery and extreme cruelty grounds after the trial began, he could have stipulated sooner and avoided expenses incurred during discovery to prove those allegations. The magistrate court did not award a specific amount. The district court found the magistrate court did not abuse its discretion in

awarding attorney fees and found it was a "well-reasoned decision" made within the bounds of reason and law.

When a trial court's discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine whether the lower court: (1) correctly perceived the issue as one of discretion; (2) acted within the boundaries of such discretion; (3) acted consistently with any legal standards applicable to the specific choices before it; and (4) reached its decision by an exercise of reason. *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018). Chris raises two arguments related to attorney fees. The first argument focuses on the number and weight of the factors utilized, and the second argument focuses on the perceived lack of substantial and competent evidence on which the award was based. First, Chris argues an award cannot be made on just one factor, and furthermore, financial factors are the primary factors in considering whether an award is appropriate and are, therefore, given more weight. Chris argues Shawnee is financially capable of paying her own fees and the award was unnecessary and punitive. Further, Chris asserts the magistrate court did not have authority to limit the award to efforts related to a single issue. Chris supports his argument by highlighting the fact that "there is no case found where a magistrate analyzed the factors of I.C. § 32-705(2) and then awarded attorney fees on **one specific issue** involved in the divorce, as the magistrate did here regarding fault grounds." (Emphasis original.)

We first address whether the magistrate court awarded fees based on only one factor of I.C. § 32-705. The short answer is that it did not. The magistrate court listed and then thoroughly analyzed each statutory factor. It noted Chris was the party at fault in the divorce based on his stipulation to the divorce on the grounds of adultery and extreme cruelty. But the magistrate court explicitly rejected awarding attorney fees based only on the fault factor:

> As Chris notes, it is tempting to "vindicate" a "sense of justice" and award Shawnee all attorney's fees on fault grounds. . . . However, even given the Court's discretion in this matter, the Court believes it would be improper to have the determination of attorney's fees issue turn on one factor.

Thereafter, after noting it was considering all factors, the magistrate court awarded attorney fees "only for the sums expended pursuing the claims of adultery and extreme cruelty" because Chris waited until trial and then stipulated to those grounds. The magistrate court's analysis is precisely what a trial court is expected to do: make factual findings, apply the law to those factual findings, and explain its reasoning in reaching its conclusion. There is no error in the magistrate court's

19

exercise of its discretion in limiting the award of attorney fees to Shawnee. The district court affirmed the magistrate court's award of attorney fees, finding the magistrate court explained its reasoning with sufficient depth for each factor under the statute. We agree.

In *Pelayo*, the magistrate court awarded, and the appellate courts affirmed, attorney fees to the wife concluding "a disparity in income alone is sufficient to support a finding that the higher income spouse should pay a share of the other spouse's attorney fees." *Pelayo*, 154 Idaho at 865, 303 P.3d at 224. The Idaho Supreme Court found the district court did not err in affirming the award of attorney fees because "the magistrate court extensively analyzed the factors listed in I.C. § 32-705." *Id.* Thus, even if in this case the magistrate court had awarded limited attorney fees based only on one factor, *Pelayo* demonstrates a court's appropriate exercise of its discretion permits an award of attorney fees based on a single factor. Additionally, I.C. § 32-705(2) does not limit a court's discretion so long as the court considers and evaluates the circumstances surrounding the request for fees. Furthermore, while financial considerations are often a key issue in deciding the appropriateness of an attorney fee award, it is not the sole or primary factor to consider. In short, neither the statute nor precedent prohibits the court from making a finding based on one factor for a limited award, although that is not what the magistrate court did in this case.

Second, Chris argues the magistrate court lacked substantial and competent evidence to reach the decision to award fees on the adultery and extreme cruelty bases because he believed Shawnee had abandoned her claim. He argues that because the written order of the court permitting the amended counterpetition was not filed until a year and a half later, he thought the claims were abandoned and there was nothing to stipulate to prior to trial. Shawnee argues the magistrate court's order granting Shawnee's request to file an amended answer and counterpetition for the sole purpose of alleging adultery and extreme cruelty as her grounds for divorce from Chris was effective when the motion was orally granted at the May 24, 2017, hearing.

"[A] judge's ruling from the bench is effective when it is entered on the record." *Katseanes v. Katseanes*, 171 Idaho 478, 485, 522 P.3d 1236, 1243 (2023). In his opening brief, Chris concedes the motion was orally granted, writing, "At the hearing held May 24, 2017, the magistrate granted Shawnee's *Motion to Amend Counterpetition for Adultery and Extreme Cruelty*; however, the *Order on Motion to Amend Counterpetition for Adultery and Extreme Cruelty* was not entered

20

until November 2, 2018, just three days before trial was set to begin."[5] At the May 24, 2017, hearing, Chris did not object to the motion to amend stating, "First of all, in regard to the motion to amend, we don't have any objection to the amended petition being--or counter-petition, I guess, being filed. So that takes care of that issue." At the conclusion of the hearing, the magistrate court said, "so there's no objection to the motion to amend. I'll ask you to prepare that order and file that amendment, [Shawnee]." It was understood by both parties, as Chris indicated at the hearing and concedes in his opening brief, that the magistrate court granted the motion. As a result, Chris was on notice that Shawnee was pursuing divorce on the grounds of adultery and extreme cruelty at the time of the oral pronouncement on May 24, 2017. Chris points to nothing other than the fact that the written order granting the amendment was issued long after the motion to amend was orally granted. This is not persuasive evidence to support Chris's belief that Shawnee abandoned the claims. Therefore, the magistrate court had substantial and competent evidence to reach its conclusion, and the district court did not err in affirming its decision.

**D.    The Judgment and Decree of Divorce Was Not Modified Regarding the Marital Home**

Chris argues the district court erred in affirming the decision of the magistrate court denying his motion for possession of the home and his motion to reconsider the memorandum decision. He argues the magistrate court modified the decree by allowing Shawnee to retain possession and refinance the marital home outside of the ninety-day window mandated by the original decree filed in 2019 and, as a result, the magistrate court acted outside of its jurisdiction. Chris argues that because Shawnee did not seek permission for an extension, pursuant to the language of the decree, possession and control of the refinancing process should have been granted to him. Shawnee argues the only relief Chris sought was possession of the home and the magistrate court rightfully determined the decree did not provide for Chris's possession in the event Shawnee did not timely refinance the home. She argues the magistrate court did not modify the amended judgment and decree of divorce entered on March 7, 2020.

---

[5]    In his reply brief, Chris argues the magistrate court did not orally grant the motion to amend but instead asked Shawnee's counsel to prepare the amendment and order. "[T]his Court will not consider arguments raised for the first time in the appellant's reply brief." *Suitts v. Nix*, 141 Idaho 706, 708, 117 P.3d 120, 122 (2005).

21

On intermediate appeal, the district court agreed with Shawnee that none of the judgment and decrees of divorce provided Chris with the right of possession in the event of Shawnee's failure to timely refinance the home. Moreover, by the time the district court heard oral argument on the appeal, Shawnee had completed the refinancing requirements and paid Chris his half of the equity. The district court held that the language of the decree in all versions (original, first, and second amended judgments) did not provide the relief Chris sought, and Chris received what he was entitled to in the judgments. The district court did not err.

"This Court has long recognized that a court's jurisdiction to amend or set aside the judgment in a case does not continue forever." *Kantor v. Kantor*, 160 Idaho 803, 807, 379 P.3d 1073, 1077 (2016) (quoting *State v. Hartwig*, 150 Idaho 326, 329, 246 P.3d 979, 982 (2011)). "In the absence of a statute or rule extending its jurisdiction, a trial court loses subject matter jurisdiction to amend or set aside a judgment once the judgment has become final, either by expiration of the time for appeal or affirmance of the judgment on appeal." *Id.* (quoting *Hartwig*, 150 Idaho at 330 n.3, 246 P.3d at 983 n.3). Further, "parties to an action cannot confer or create subject matter jurisdiction upon or in a court if in fact it does not exist." *Id.* (quoting *Fairway Dev. Co. v. Bannock Cnty.*, 119 Idaho 121, 125, 804 P.2d 294, 298 (1990)). "'[S]ubject matter jurisdiction can never be waived or consented to' and 'judgments and orders made without subject matter jurisdiction are void.'" *Id.* (quoting *State v. Lute*, 150 Idaho 837, 840, 252 P.3d 1255, 1258 (2011)).

Chris asks this Court to consider the initial judgment and decree of divorce filed October 30, 2019, as the final judgment which would start the time for Shawnee's ninety-day timeframe to refinance. However, not only did Chris appeal from that decision on November 6, 2019, numerous motions were filed following the initial judgment and decree asking for reconsideration regarding property, including the marital home, financial accounts, and other disputed aspects, which required additional hearings. As a result of one of Chris's motions for reconsideration, an amended judgment and decree of divorce was entered March 7, 2020. Chris filed a motion for possession of the home on April 15, 2020, arguing Shawnee was outside of the ninety-day window to refinance the home as the decree provided and Shawnee filed a motion to stay the enforcement of the order on April 21, 2020. A hearing on the motion was held on August 14, 2020. Chris argued the October 30 judgment date as the date of judgment, and the magistrate court rejected his argument, stating:

22

I'm not--I'm just not buying that argument. My order says "after the entry of judgment," and the judgment was entered on March 7th. I don't--until the judgment was finalized, I don't see any way I can expect either party to comply with the judgment until it's actually entered.

The magistrate court denied the motion for possession and granted the motion to stay. The magistrate court did not act without subject matter jurisdiction as it was not modifying a final, unappealable decision, and the court had both jurisdiction and authority to consider the matters identified within the motions to reconsider. *See* I.R.F.P. 503(b), 805, 807. Thus, when the magistrate court entered an amended judgment and decree of divorce on March 7, 2020, it was acting within its jurisdiction and authority.

Having established that the magistrate court had subject matter jurisdiction, the question on appeal is whether the magistrate court improperly amended the judgment and decree of divorce. When the magistrate court denied Chris's motion for possession, it looked at the specific relief sought by Chris, which was possession of the home. The motion did not mention Chris's desire or ability to refinance the home. The magistrate court pointed out:

[I]f [Chris] were serious about following the judgment, then he would have come in with this motion and said, "She's given up her time frame. Now I want to refinance the two debts, and I am capable of doing that." And instead, all he wants is for her to be removed from possession of the home and that he be allowed to take possession.

The magistrate court continued, finding that:

[T]he judgment doesn't say that he'll be given possession of the home. It says he'll be awarded the home with the--Chris will be awarded the home at a value of--so long as he refinances. So there's nothing in the judgment that says Mr. Farnsworth ever gets possession of the home. That's not one of the enforcement mechanisms within the judgment.

The disputed language is in the initial, amended, and second amended judgment and decree of divorce. It reads:

The home and real property located at 3524 Nathan Circle is awarded to Shawnee at a value of $295,000.00. She shall have ninety (90) days from the date the Judgment and Decree of Divorce is entered to remove Chris's name from the liability on the two (2) debts which are secured by the marital home and to pay Chris one-half of the equity in said home. The "equity" in the home shall be determined by subtracting the two debts which are secured by the home, as of the date the Judgement and Decree of Divorce is entered, from the $295,000.00 value of the home. If Shawnee does not do so, then Chris will be awarded the home at a value of $295,000.00, so long as he refinances the two (2) debts owed against the home and pays Shawnee one-half of the equity in said home, with the "equity"

23

being determined by subtracting the two debts which are secured by the home, as of the date the Judgement and Decree of Divorce is entered, from the $295,000.00 value of the home. If Chris does not do so, then the home and real property shall be sold, and both parties shall cooperate with the sale of said home. If the home is sold, the parties shall share, equally, the net equity after the two (2) debts secured by the home are paid in full and after all closing costs are paid. Whichever party is in possession of the home after the Judgment and Decree of Divorce is entered, shall pay 100% of any and all expenses and costs related to the home, which includes the two debts secured by the home, utilities, taxes, insurance, upkeep, and the like.

At the hearing on the motion, Chris asked for possession of the home: "We are asking that Shawnee specifically give possession of the home to my client at this point in time." At the time of the hearing, Shawnee had completed nearly all the steps for refinancing and only needed to close to finish the process. Chris continued to argue the timeframe for refinancing had been exceeded and he should receive possession of the home. The magistrate court questioned him, asking, "So you're saying that she has--what you're arguing is that you want to prevent her from now complying with the judgment because the timeline has passed?" to which Chris said, "Correct. Correct." The magistrate court denied the motion.

Chris's assertion that the magistrate court modified the judgment by allowing refinancing outside of the ninety-day window is unpersuasive because he relies on the October 30, 2019, date as the date of an enforceable judgment and the beginning of the ninety-day timeframe. Numerous motions were filed between November 11 and December 23, 2019, including a motion objecting to attorney fees, a motion to stay, and motions to reconsider. Chris further filed an objection to the proposed amended judgment and decree of divorce on March 3, 2020. With the appeals, the motions and objections, and additional hearings to resolve substantive disputes regarding the content of the divorce decree, there was not a final, enforceable order until the March 7, 2020, amended judgment, as noted by the magistrate court. Chris's motion for possession was filed April 15, 2020, thirty-nine days after the amended judgment was issued, which was prior to the end of Shawnee's ninety days for refinancing. Shawnee had already begun the process of refinancing the home when she filed the motion to stay proceedings. By the time the motions were argued at the hearing in magistrate court, Shawnee had nearly completed the refinancing process, waiting only for a ruling on the motion to stay to close on the transaction. While it is true that by the August 14, 2020, motion hearing, Shawnee was outside of the ninety-day timeframe, by that time, all she had left to do was close on the new mortgage. Moreover, Chris has not shown that

24

the magistrate court was in error to conclude that the judgments did not expressly provide for possession to automatically transfer to Chris at the expiration of the ninety days.

More importantly, on appeal, it is not sufficient simply to show error; a "party alleging error must also show that the error affected the party's substantial rights." *Reed v. Reed*, 160 Idaho 772, 775, 379 P.3d 1042, 1045 (2016). Indeed, Idaho Rule of Civil Procedure 61 provides that "at every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." I.R.C.P. 61. "A right is substantial if it could affect the outcome of litigation." *Bromund v. Bromund*, 167 Idaho 925, 932, 477 P.3d 979, 986 (2020). "[B]ecause an appellant can only prevail if the claimed error affected a substantial right, the appellant must present some argument that a substantial right was implicated." *Hurtado v. Land O'Lakes, Inc.*, 153 Idaho 13, 18, 278 P.3d 415, 420 (2012).

Here, Chris has not pointed to any error affecting his substantial rights, especially because after the hearing in magistrate court, Shawnee completed the refinancing process, removed Chris from the mortgage documents, and paid Chris his one-half share of the equity. In fact, according to Shawnee's respondent's brief on intermediate appeal filed August 16, 2022, Shawnee already completed all the requirements regarding the marital home, i.e., refinancing it, removing Chris from any financial obligations, and paying Chris his share of the equity. As found by the district court, Chris received his share of the equity before briefing the issue on intermediate appeal. At this point, the issue has long been resolved and we fail to see the point of the appeal on this issue. Therefore, the magistrate court had substantial and competent evidence to reach its conclusion, and the district court did not err in affirming its decision.

## E.     Attorney Fees on Appeal

Each party seeks attorney fees on appeal. Idaho Code § 12-121 permits the award of reasonable attorney fees to the prevailing party or parties when the case brought is pursued or defended frivolously, unreasonably, or without foundation. On appeal, Chris is not the prevailing party on any claim and, thus, is not eligible for an award of attorney fees. Shawnee asks for attorney fees, but we conclude the appeal is not frivolous, unreasonable, or without foundation, and therefore decline to award Shawnee attorney fees. As a result, neither party is awarded attorney fees on appeal.

## IV.
## CONCLUSION

The district court did not err in affirming the magistrate court's determination and characterization of the joint tenant with rights of survivorship account held by Edward Jones as containing both separate and community funds because Chris failed to meet his burden of showing the account had been transmuted into community property. The district court did not err in affirming the magistrate court's characterization of the PERSI Choice 401(k) account as community property. The district court did not err in affirming the magistrate court's award of attorney fees to Shawnee on a limited basis because the magistrate court did not abuse its discretion after considering all the factors under I.C. § 32-705. Finally, the district court did not err in affirming the magistrate court's award of the marital home because the magistrate court did not modify the divorce decree when it permitted Shawnee to complete the refinancing. Therefore, we affirm the Memorandum Decision and Order Re: Appeal of the district court. Costs are awarded to Shawnee.

Chief Judge GRATTON and Judge LORELLO, **CONCUR**.